IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

IN RE FOUR APPLICATIONS FOR
SEARCH WARRANTS SEEKING
INFORMATION ASSOCIATED WITH          CRIMINAL NO. 3:25-cr-38-CWR-ASH
PARTICULAR CELLULAR TOWERS
A/K/A TOWER-DUMP WARRANTS

## BRIEF OF *AMICI CURIAE* NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF MISSISSIPPI, ELECTRONIC FRONTIER FOUNDATION, AND THE OFFICE OF THE STATE PUBLIC DEFENDER

Joshua Tom (MSB # 105392)
ACLU of Mississippi
101 South Congress Street
Jackson, MS 39201
jtom@aclu-ms.org

*Counsel for ACLU, ACLU of Mississippi, & EFF*

André de Gruy
State Defender Office of State Public Defender
239 N. Lamar Street, Suite 700
Jackson MS 39201
adegr@ospd.ms.gov

*Counsel for the Office of the State Public Defender*

Goodloe T. Lewis (MSB # 9889)
Hickman, Goza, & Spragins, PLLC
Post Office Dawer 668
Oxford, MS 38655
glewis@hickmanlaw.com

*Counsel for NACDL*

Michael W. Price (*pro hac vice*)
  *Ligitation Director, Fourth Amendment Center*
Cynthia H. Orr (*pro hac vice*)
  *Vice Chair, Amicus Committee*
National Association of Criminal Defense Lawyers
1660 L. St. NW, 12th Fl.
Washington, DC  20036
mprice@nacdl.org
whitecollarlaw@gmail.com

*Counsel for NACDL*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Local Rule 7(c), *Amici Curiae* state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.


Dated: August 29, 2025                                   /s/Goodloe Lewis

                                                              _____
                                                              Goodloe Lewis
                                                              *Counsel for Amici Curiae*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iv

INTERESTS OF AMICI CURIAE ................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................... 3

BACKGROUND ............................................................................................. 5

   I.   How Cellular Networks Work ........................................................... 5

   II.  How Tower Dumps Work .................................................................. 8

   III. The Warrants in This Case ............................................................. 10

ARGUMENT ................................................................................................ 11

   I.   Tower Dumps Trigger Fourth Amendment Protections .................. 13

      A.   People Have a Reasonable Expectation of Privacy in CSLI Obtained from a Tower Dump ........................................................................... 13

      B.   People Have a Property Interest in CSLI Obtained from a Tower Dump .. 19

   II.  Tower Dumps Are General Warrants ............................................. 23

   III. Tower Dumps Intrude on First Amendment Associational Rights. ............... 30

CONCLUSION ............................................................................................. 33

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Buckley v. Valeo,*
   424 U.S. 1 (1976)...................................................................................30

*Carpenter v. United States,*
   585 U.S. 296 (2018)...........................................................................Passim

*Coolidge v. New Hampshire,*
   403 U.S. 443 (1971)...............................................................................24

*Ex parte Jackson,*
   96 U.S. 727 (1878)..................................................................................20

*Florida v. Jardines,*
   569 U.S. 1 (2013)....................................................................................19

*Groh v. Ramirez,*
   540 U.S. 551 (2004)...............................................................................28

*Second Report & Order and Further Notice of Proposed Rulemaking, In re*
*Implementation of the Telecomms. Act of 1996,*
   13 FCC Rcd. 8061 (1998)......................................................................22

In re *Implementation of the Telecomms. Act of 1996: Telecomms. Carriers' Use of*
*Customer Proprietary Network Info. and Other Customer Info.,*
   28 FCC Rcd. 9609,¶ 22, 9619 ¶ 29 (2013).........................................22

*In re Search of Info. Stored at Premises Controlled by Google,*
   481 F. Supp. 3d 730 (N.D. Ill. 2020)............................................17, 29

*In re Search of Info. that is Stored at Premises Controlled by Google,*
   542 F. Supp. 3d 1153 (D. Kan. 2021)..................................................27

*Kyllo v. United States,*
   533 U.S. 27 (2001)............................................................................13, 15

*Lo-Ji Sales, Inc. v. New York,*
   442 U.S. 319 (1979)...............................................................................28

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982)..................................................................................20

*Marcus v. Search Warrants of Property*,
  367 U.S. 717 (1961)..............................................................................23, 28

Maryland v. Garrison,
  480 U.S. 79 (1987)...................................................................................27

*Matter of Search of Info. Associated with Cellular Tel. Towers Providing Serv. to
[Redacted] Stored at Premises Controlled by Verizon Wireless*,
  616 F. Supp. 3d 1 (D.D.C. 2022)..............................................................5

*NAACP v. Alabama*,
  357 U.S. 449 (1958)..............................................................................30, 31

*Owens ex rel. Owens v. Lott*,
  372 F.3d 267 (4th Cir. 2004)...................................................................26

*People v. Weaver*,
  909 N.E.2d 1195 (N.Y. 2009)..................................................................31

*Quantity of Copies of Books v. Kansas*,
  378 U.S. 205 (1964)................................................................................28

*Riley v. California*,
  573 U.S. 373 (2014)........................................................................11, 20, 23

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984)................................................................................30

*Snitko v. United States*,
  90 F.4th 1250 (9th Cir. 2024)..................................................................27

*Soldal v. Cook Cty.*,
  506 U.S. 56 (1992)..................................................................................19

*Stanford v. Texas*,
  379 U.S. 476 (1965).........................................................................4, 28, 30

*State v. Wright*,
  961 N.W.2d 396 (Iowa 2021)...................................................................21

*Steagald v. United States*,

451 U.S. 204 (1981)..................................................................................24

*U.S. West, Inc. v. F.C.C.,*
    182 F.3d 1224 (10th Cir. 1999)............................................................22

*United States v. Chatrie*
    136 F.4th 100 (4th Cir. 2025)...............................................................26

*United States v. Chatrie,*
    590 F. Supp. 3d 901 (E.D. Va. 2022).....................................................26

*United States v. Fuentes,*
    2025 WL 484628 (E.D. Ok. 2025).....................................................27, 29

*United States v. Galpin,*
    720 F.3d 436 (2d Cir. 2013)..................................................................28

*United States v. Jones,*
    565 U.S. 400 (2012).....................................................................Passim

*United States v. Karo,*
    468 U.S. 705 (1984)..............................................................................15

*United States v. Knotts,*
    460 U.S. 276 (1983)..............................................................................23

*United States v. Reynolds,*
    86 F.4th 332 (6th Cir. 2023).................................................................5, 6

*United States v. Reynolds,*
    626 F. App'x 610 (6th Cir. 2015)...............................................................5

*United States v. Smith,*
    110 F.4th 817 (5th Cir. 2024).......................................................16, 25, 26, 29

*United States v. Warshak,*
    631 F.3d 266 (6th Cir. 2010).................................................................20

*Ybarra v. Illinois,*
    444 U.S. 85 (1979)................................................................................24

*Zurcher v. Stanford Daily,*
    436 U.S. 547 (1978)..............................................................................26

Statutes

18 U.S.C. § 2703(c)(2)................................................................16

47 U.S.C. § 207.......................................................................21

47 U.S.C. § 222(c)(1)–(2), (h)(1)(A).....................................21

47 U.S.C. § 222(f).................................................................21

47 U.S.C. § 1002(a)(2)..........................................................22

U.S. Const. amend. I.............................................................29

U.S. Const. amend. IV...........................................................12

Other Authorities

Reversing Privacy Risks: Strict Limitations on the Use of Communications
Metadata and Telemetry Information,
    21 Colo. Tech. L.J. 225 (2023)....................................................31

The Fourth Amendment Implications of the Government's Use of Cell Tower Dumps
in its Electronic Surveillance,
    16 U. Pa. J. Const. L. 1 (2013)....................................................8

The Positive Law Model of the Fourth Amendment,
    129 Harv. L. Rev. 1821 (2016).....................................................21

## INTERESTS OF AMICI CURIAE[1]

The National Association of Criminal Defense Lawyers ("NACDL") is a nonprofit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime or misconduct. Founded in 1958, NACDL has a nationwide membership of many thousands of direct members, and up to 40,000 with affiliates, comprised of private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges. NACDL has a particular interest in cases that involve surveillance technologies and programs that pose new challenges to personal privacy. NACDL operates the Fourth Amendment Center and has filed numerous *amicus* briefs on issues involving digital privacy rights.

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit, nonpartisan organization dedicated to defending the principles embodied in the Federal Constitution and our nation's civil rights laws. The ACLU of Mississippi is the state affiliate of the ACLU. For decades, the ACLU has been at the forefront of efforts nationwide to protect the full array of civil rights and liberties, including the right to the protections enshrined in the Fourth Amendment to the Federal Constitution. The ACLU has appeared in numerous cases, both as direct counsel and as *amici*, before courts in Mississippi and throughout the nation in cases

---

[1] The undersigned certify that no party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was used to fund the preparation or submission of this brief; and no persons other than amicus curiae or its counsel contributed money that was intended to fund the preparation or submission of this brief.

involving the meaning and scope of the rights of criminal defendants and the legal limitations on the use of technology by police and prosecutors.

The Electronic Frontier Foundation ("EFF") is a member-supported, nonprofit civil liberties organization that has worked to protect free speech and privacy rights in the online and digital world for 35 years. With over 30,000 active donors, EFF represents technology users' interests in court cases and broader policy debates. EFF regularly participates as amicus in federal and state courts, including in the United States Supreme Court, in cases addressing the impact of novel technologies on criminal investigations and the justice system.

The Mississippi Office of State Public Defender ("OSPD") is a state agency that works on behalf of indigent criminal defendants in the state courts of Mississippi and provides training and technical assistance to other attorneys representing indigent defendants in these courts. Conservative estimates place the number of all criminal defendants who are indigent at 80%. The State Defender, as director of the agency, is explicitly authorized by statute "to act as spokesperson for all matters relating to indigent defense representation." OSPD through its training division has provided numerous training programs involving digital privacy rights. OSPD-Training is a state affiliate of the NACDL.

## INTRODUCTION AND SUMMARY OF ARGUMENT

As part of an ongoing investigation into gang activity, in which the government had already identified seven gang members, investigators sought private information about, and the property of, potentially hundreds or thousands of people. They did so by requesting historical cell site location information (CSLI) of all individuals whose phones connected to several cell-phone towers during designated periods of time, a technique known as a "tower dump." This electronic dragnet is a fundamentally new and invasive technology that evades longstanding practical barriers to sweeping police surveillance. Even data from a single cell phone tower can reveal presence inside the home or a place of worship, at a protest or political rally, or coming and going from a hospital—not just for one individual, but for everyone with a phone who was present within the requested period of time.

Tower dumps are searches that trigger Fourth Amendment protections. Tower dumps reveal comprehensive, retrospective, and intimate information that police could never have amassed before the cell-phone age with such ease, if at all. They also intrude on potentially thousands of people's property rights in their cell phone location records. By collecting information otherwise unknowable through traditional surveillance techniques and interfering with people's property interests in their digital "papers," tower dumps constitute searches and seizures under the Fourth Amendment to the U.S. Constitution.

The extraordinary breadth of tower dumps renders them general searches that no warrant can constitutionally sanction. The Fourth Amendment was adopted

mainly as a response to the general warrants and writs of assistance that authorized unconstrained searches of private places, papers, and effects without probable cause and without particularly describing the place to be searched. *See, e.g.*, *Stanford v. Texas*, 379 U.S. 476, 481–85 (1965). Because a tower dump necessarily sweeps up information about troves of people with no connection to the crime under investigation, a warrant purporting to authorize such collection is void as a general warrant. Such digital dragnets lack probable cause to obtain even one person's CSLI, let alone the CSLI belonging to hundreds or thousands of people who happened to be "in the general vicinity" of nine locations in urban and suburban areas. ECF No. 6 at 2. They likewise demonstrate a profound lack of particularity, leaving it up to investigators to rummage through this cache of private data for years at their sole discretion. Such general warrants are wholly incompatible with the Fourth Amendment.

Tower dumps also adversely impact the public's First Amendment right to freedom of association, revealing who called whom and who is spending time together. Knowledge that the government can easily obtain this information for thousands of people at once and rummage through it at will has a chilling effect on associational freedoms, intruding on our political, professional, and personal associations as well as our basic communications. Searches that implicate these First Amendment rights demand heightened attention to the Fourth Amendment's probable cause and particularity requirements. *See Stanford*, 379 U.S. at 485. Tower dumps fall well short of this mark and are therefore unconstitutional.

**BACKGROUND**

## I.    How Cellular Networks Work

Cellphones function by exchanging radio signals between the phone's internal antennas and cell towers or "cell sites." *United States v. Reynolds*, 626 F. App'x 610, 614 (6th Cir. 2015). In addition to towers, cell sites can be found on "light posts, flagpoles, church steeples, or the sides of buildings." *Carpenter v. United States*, 585 U.S. 296, 300 (2018). "Each cell tower has multiple sectors, each of which faces in a different direction," allowing each tower to provide 360 degrees of coverage. *Matter of Search of Info. Associated with Cellular Tel. Towers Providing Serv. to [Redacted] Stored at Premises Controlled by Verizon Wireless*, 616 F. Supp. 3d 1, 4 (D.D.C. 2022). Sectors are "covered by their own directive antennas. Typically, there are 3 sectors, each with about 120° angular width, but many other combinations are possible."[2] The direction or angle in which each antenna points is called the azimuth.

The goal of every cell network is to provide uniform coverage; however, actual coverage can depend on the number of towers, signal strength of antennae, topography, number of neighboring cell sites, number of calls, etc. *United States v. Reynolds*, 86 F.4th 332, 341 (6th Cir. 2023). Because of this, urban areas have more towers, both to serve more people and to account for signal disruptions from tall buildings. "Cell sites in rural areas can cover up to 60 miles while those in dense areas might cover only 300 meters." *Id*. Cell

---

[2] Vladan M. Jovanovic and Brian T. Cummings, *Analysis of Mobile Phone Geolocation Methods Used in US Courts*, IEEE Access, vol. 11, pp. 28037, 28038 (2023) https://ieeexplore.ieee.org/document/9729192.

phones most often connect to the strongest cell site in the area rather than the nearest.[3] "If the phone moves after the call is set up, it is transferred to one of the neighboring sectors, on the same or different cell. . . . In some older cellular technologies (CDMA and UMTS), after initially contacting one sector, phones could be directed to connect to several sectors simultaneously."[4]

Cellular providers record each connection to their networks, noting the cell site used, the phone's identifier, and the start, end, origination and length of the communication, among other data. Known as "call detail records" or "CDRs," these records "may contain several hundred information elements for each call."[5] Most importantly for the purposes of this case, cellular providers also record the location of the cell site, and, where relevant, the azimuth and beamwidth of the antenna used to connect the device. Through this, cellular records can reveal the approximate location of a cellular device.[6] Providers retain these records for up to seven years.[7]

Modern cell technology can create a more precise record of a phone's location than technology of the past. "5G particularly uses very high frequencies to achieve its speed, which also means 5G towers need to be placed closer together compared to 4G towers . . . In 5G networks, the cells can be as

---

[3] *Id.* at 28040 (noting that, for various reasons, cell phones do not always connect to the sector with the strongest signal).

[4] *Id.* at 28038.

[5] *Id.* at 28038.

[6] If the location of the cell site is known and if the beamwidth and azimuth are known, then an approximate area of use can be inferred for phones that used particular cells. Joseph Hoy, *Forensic Radio Survey Techniques for Cell Site Analysis*, 66–67 (2d ed. Wiley 2024) (hereinafter "Hoy").

[7] FBI CAST, Cellular Analysis & Geo-location Field Resource Guide at 74 (Mar. 2019), https://www.documentcloud.org/documents/21088576-march-2019-fbi-cast-cellular-analysis-geo-location-field-resource-guide/.

small as 2,000 feet."[8] All current digital technologies can also record measurements called "time-of-arrival (TOA)" or "Timing Advance" data "which provides particularized location and time-tracking of a device by using the device's relation to cell sites (using pings between a device and cell sites, by looking at how long it takes for a signal to travel from a device to a cell site)."[9] These records combined with the increasingly smaller 5G cells can provide "very accurate estimates of a device's location." Hoy, *supra* n.6, at 302. Some companies like AT&T have created more granular location data using proprietary tools like Network Event Location System ("NELOS") records.[10] Minimization of Drive Testing ("MDT") data can even provide handset-based GPS level precision in some instances. *See* Hoy at 305–306.

Historically, the precision of CSLI "depend[ed] on the size of the geographic area covered by the cell site." *Carpenter,* 585 U.S. at 301, and was only sufficient to place a person "within a wedge-shaped sector ranging from one-eighth to four square miles," for example. *Id.* at 312. As a result, a single CSLI data point could be used to determine which neighborhood or zip code someone was in, but it is not generally accurate enough to identify the block and building. However, records like NELOS, Timing Advance, Time Difference

---

[8] *See* Destin Watkins, *A Cops Guide to Cellular Network Investigations*, Warrant Builder (Oct. 30, 2023), https://warrantbuilder.com/cellular-network-investigations/.

[9] *See* Magistrate Judge Beth W. Jantz, *Simulating More Particularity: Ideas for Approaching Search Warrants for Geofences, Tower Dumps, and Cell-Site Simulators*, 16 Fed. Courts. L.R. 9, 15 n.16 (2024), *available at* https://www.fclr.org/content/uploads/2024/05/Jantz_FINAL-BY-BWJ.pdf.

[10] *See* John C. Ellis, Jr. *Inside the Black Box: Excluding Evidence Generated by Algorithms*, Nat'l Litig. Support Blog (Nov. 2, 2021) https://nlsblog.org/2021/11/02/inside-the-black-box-excluding-evidence-generated-by-algorithms/.

of Arrival, or MDT are considerably more precise—and in the case of MDT can contain actual GPS data. Hoy at 305.

## II.    How Tower Dumps Work

Standard tower dumps "collect all of the historical records that providers maintain from a specific cell tower or towers. These records provide a listing of any cell phones that have utilized the cell phone tower for a particular time and date."[11] Because the government, at the time of serving a tower dump warrant, specifies no suspect phone or individual human target, they must issue a warrant for every cellular provider serving the area of the crime.

In a tower dump warrant, the government requests data for a rough location and time period. There are different ways to delineate a location, but none of them precisely describe the boundaries of the geographic area to be searched. Police can request data from all towers in the vicinity of a street address; they can request it from all towers providing service to that address; and they can specify the towers or antennae most likely to have served any phones in the target area.[12] Recent reports indicate that law enforcement may also search records of devices that connected to more than one tower at a time

---

[11] Brian L. Owsley, *The Fourth Amendment Implications of the Government's Use of Cell Tower Dumps in its Electronic Surveillance*, 16 U. Pa. J. Const. L. 1, 21 (2013) (citation and quotation marks omitted).

[12] The National Domestic Communications Assistance Center ("NDCAC") assists law enforcement agencies with electronic surveillance and maintains a database of "current and archived tower list for all major (and many local) cell phone companies." *See* National Domestic Communications Assistance Center, A Hub for Technical Knowledge Management, available at https://ndcac.fbi.gov/; *see also* FBI CAST, Cellular Analysis & Geo-location Field Resource Guide at 36, *supra* n.7.

as part of a "true call" or "timing advance true call area search" warrant.[13] But in each instance, the geographic area to be searched will depend on the cell tower coverage at the time, which is typically unspecified in the warrant and may also be unknown to law enforcement. In this situation, it is impossible for reviewing courts to determine the precise boundaries of the geographic area to be searched.

Law enforcement issues tens of thousands of tower dump warrants every year. For the second half of 2024, Verizon received 5,725 tower dump warrants, while AT&T received 6,873.[14] Although T-Mobile appears to receive fewer tower dump warrants—8,773 in all of 2023—this is likely only partly true. For the same time period, it also received 29,550 "area dump warrants," which it describes as "information regarding subscribers who were near a particular geographic area within a specific date and time."[15] Each warrant may require a provider to conduct multiple searches; for the 6,873 warrants AT&T received, it conducted 25,143 searches.[16] Cell provider responses to any individual warrant can produce thousands or even hundreds of thousands of records on individual devices that happened to be in the vicinity of a cell tower around the time of the

---

[13] Thomas Brewster, *AT&T And T-Mobile Are Giving Cops Geofenced Location Data, Even Though It's Inaccurate*, Forbes (Feb. 23, 2024), available at https://www.forbes.com/sites/thomasbrewster/2024/02/23/att-t-mobile-geofence-orders.

[14] Verizon United States Transparency Report—2024 2nd Half, 5, https://www.verizon.com/about/investors/transparency-report; AT&T, February 2025 Transparency Report at 4, available at https://sustainability.att.com/ViewFile?fileGuid=26a13912-fe8b-429b-a517-76ab824fa104.

[15] T-Mobile US, Inc., Transparency Report at 6 (2023), available at https://www.t-mobile.com/news/_admin/uploads/2024/07/2023-Transparency-Report.pdf.

[16] AT&T, Transparency Report, *supra* n.14.

crime.[17] And the data can be highly revealing. While law enforcement could limit data requested to an electronic identifier for each device/customer and the tower and sector it connected to, it may also request more data, including, as in this case, "the date, time, and duration of each communication; . . . the source and destination telephone numbers associated with each communication . . . and . . . the type of communication transmitted . . . (such as phone call or text message)." *See* ECF No. 6 at 2.

### III.  The Warrants in This Case

The warrants in this case sought all customer records from four providers for any and all individuals who connected to any one of an unidentified number of towers in geographic areas corresponding to nine criminal incidents over a nearly four-hour period. *See* ECF No. 6 at 2–3. The warrants did not identify a person or account to be searched, even though police had already identified seven potential suspects (and presumably the suspects' phone numbers). *Id.* at 13. The warrants apparently did not identify the specific cell sites from each carrier that the government was targeting nor the specific antennae connected to each cell site they were targeting. *Id.* at 2; *see also* n.3 (noting that multiple towers may serve each location in the warrant and requiring production of data about cell sectors "for each cell tower providing service to the described locations"). The warrants did not limit the data to be turned over in the dump

---

[17] The FBI once received 150,000 records in response to tower dump warrant. *See* Katie Haas, Cell Tower Dumps: Another Surveillance Technique, Another Set of Unanswered Questions, ACLU (Mar. 27, 2014), available at https://www.aclu.org/news/national-security/cell-tower-dumps-another-surveillance-technique.

to a single account identifier or other pseudonymous data. Instead, they requested every piece of data possibly connected to any users in the undefined geographic area. *Id.* at 2.

Finally, although the government admitted the responsive data would be "voluminous" and would include information on "otherwise innocent and uninvolved users," the warrants provided only a very limited plan for handling the data. *Id.* at 3. The government stated it would not dispose of innocent third party data until *after* the final disposition or the investigation at issue, including final appeals—potentially years. *Id.* It also stated it would not make use of this "extraneous" data without a court order, *id.*, which requires a lower standard than a warrant. It also did not fully rule out using this data, which the government would not otherwise have had access to, for entirely unrelated investigations. In short, the warrants allowed the government to seize potentially tens of thousands of innocent people's sensitive personal data; hold onto it for an unspecified amount of time, without probable cause to do so; and search that data without a warrant for potentially years into the future.

## ARGUMENT

Cell phones have become "'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society." *Carpenter*, 585 U.S. at 315 (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)). And consequently, law enforcement's ability to access sensitive digital data generated by cell phones has ballooned. Historical CSLI not only allows investigators to track a

known individual's past movements, but through tower dumps, enables them to identify *every* previously unknown cellphone user in the range of a cell tower during any given timeframes.

This is an unprecedented investigatory power. If police want to know who was near the scene of an alleged crime—months or even years later—cell tower data can turn back the clock and allow them to surveil the past.[18] Each tower dump exposes thousands of people to law enforcement's eye, and as noted above, wireless providers receive many thousands of requests each year. Moreover, the government may retain all of this information for years in the future and access it again for other purposes without obtaining a new warrant. And critically, tower dumps allow the government to do so without the probable cause or particularity required to search even one person's data.

The tower dumps at issue here are thus not only searches under the Fourth Amendment, but impermissible general warrants. As explained below, cell phone users have a reasonable expectation of privacy in their historical CSLI, even in limited quantities, because it reveals their whereabouts, including their presence in constitutionally protected spaces, and permits the government to view more than would otherwise be publicly observable. Additionally, users have a property interest in their CSLI because it is a modern-day version of the "papers" and "effects" that the Framers chose to protect against "unreasonable searches and seizures." U.S. CONST. amend. IV. As a result, a valid warrant is required to search even a "snapshot" of it, as the Magistrate Judge correctly concluded. *See* ECF No. 6 at 9.

---

[18] FBI CAST, Cellular Analysis & Geo-location Field Resource Guide *supra* n.7.

But a tower dump is not a valid warrant. Rather than establishing probable cause to search a suspect's data, it operates in reverse: seeking to search and seize the CSLI of *everyone* in the vicinity of nine locations in the hopes of identifying a suspect later. Or as Magistrate Judge Harris put it, "the Government is essentially asking the Court to allow it access to an entire haystack because it may contain a needle"—and "the haystack here could involve the location data of thousands of cell phone users in various urban and suburban areas." *Id*. at 14. In short, the tower dumps sought by the government here amount to a digital dragnet, devoid of the probable cause and particularity that the Fourth Amendment demands. This Court should therefore affirm the magistrate's order denying the warrant applications and hold that tower dumps are unconstitutional general warrants.

## I.    Tower Dumps Trigger Fourth Amendment Protections

### A.  People Have a Reasonable Expectation of Privacy in CSLI Obtained from a Tower Dump

To ensure that technology does not erode the "degree of privacy against government that existed when the Fourth Amendment was adopted," the United States Supreme Court has repeatedly held that the use of technology to collect information effectively unknowable through traditional techniques triggers constitutional protections. *Carpenter*, 585 U.S. at 305 (quoting *United States v. Jones*, 565 U.S. 400, 406 (2012) (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)). As Justice Alito explained in *Jones*, because "[i]n the precomputer age, the greatest protections of privacy were neither constitutional nor statutory, but

practical," technologies that allow easy evasion of those practical limits require constitutional regulation. 565 U.S. at 429 (Alito, J., concurring).

There is little question that tower dumps are such a technology. Police have never before had the capability to call up a near-perfect record of virtually *every* person who was in a particular area at a particular time, months or years earlier, including inside homes and other constitutionally protected spaces. Like a time machine, tower dumps enable law enforcement to reconstruct the historical movements of hundreds or thousands of people at once, limited only by corporate retention policies. *See Carpenter*, 585 U.S. at 312. Such a feat would have been impossible at the time of the adoption of the Fourth Amendment, limited by "a dearth of records and the frailties of recollection." *Id.* Instead, tower dumps represent an unprecedented expansion of law enforcement's ability to locate people in time and space, granting police "access to a category of information otherwise unknowable." *Id.*

As in *Carpenter*, the CSLI generated by tower dumps is "qualitatively different" from traditional forms of police surveillance because it is "comprehensive," "retrospective," "intimate," and "easy" to access for investigators. *Id.* at 309–312. It is comprehensive because it provides "near perfect surveillance, as if [the government] had attached an ankle monitor to the phone's user." *Id.* at 312. Indeed, users generate it with sufficient frequency that it "faithfully follows" cell phone users wherever they go, including "private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Id.* at 311. Such

continuous and absolute surveillance, for hundreds or thousands of people at once, is without parallel in traditional investigative techniques.

The tower dump data here is also just as "retrospective" as the CSLI at issue in *Carpenter*. Indeed, it is the same data, collected and retained for years, and capable of "reconstruct[ing] a person's movement[]," such that the person "has effectively been tailed every moment of every day for five years." *Id.* at 312. But here, it not only allows police to "travel back in time" and retrace one person's whereabouts with precision, but enables them to do so for everyone, *en masse*, without knowing who to follow in advance. *Id.* And as in *Carpenter*, because there are "400 million devices in the United States," and not just those belonging to suspects, "this newfound tracking capacity runs against everyone." *Id.*

Tower dumps are also intimate and deeply revealing because even a small number of location data points discloses individuals' private whereabouts and facilitates inferences about their habits of life. The data can disclose the location of individuals (including, necessarily, non-suspects) in non-public and constitutionally sensitive places, such as the home, doctor's office, protest, or place of worship. *See, e.g., id.* at 311. And the Supreme Court has repeatedly found that precise, short-term searches run afoul of the Fourth Amendment where, as here, they could reveal information inside constitutionally protected spaces. *See United States v. Karo*, 468 U.S. 705, 715 (1984) (Fourth Amendment protects against warrantless electronic tracking that locates a person in their home, especially when such presence "could not have been visually verified" by police); *Kyllo*, 533 U.S. at 30, 37 (finding using

15

thermal imaging to peer through walls of a home a search, even though scan "took only a few minutes" and could not show much detail inside). Additionally, police can use tower dump data to identify relationships between people where, as here, the call detail records include "source and destination numbers" associated with any communication that occurred in the vicinity. ECF No. 6 at 2. As a result, tower dumps can identify the friends, family, and other intimate associates of the thousands of people caught up in the sweep.[19]

It is of little importance that the duration of the intrusion sought by the government here is shorter than in *Carpenter*. As Magistrate Judge Harris recognized, "the *quantity* of location data points does not control." ECF No. 6 at 9. Rather, as the Fifth Circuit instructed in *United States v. Smith*, "the potential intrusiveness of even a snapshot of precise location data should not be understated." 110 F.4th 817, 833 (5th Cir. 2024). Indeed, the tower dumps here would encompass "residential neighborhoods, a mall, medical clinics, schools, shopping centers, a supermarket, churches, a courthouse, hotels, interstate highways, a train station, and an airport." ECF No. 6 at 10. Thus, the nearly four hours of CSLI at issue here could reveal a great deal about users' private and activities constitutionally protected activities.

The Supreme Court decided *Carpenter* on the facts before it, and the shorter of the two court orders at issue was for a period of seven days. *Carpenter*, 585 U.S. at 302. Seven days was not a magic number with some higher constitutional

---

[19] Law enforcement can easily identify people in the records by issuing an administrative subpoena to the service provider seeking names and other subscriber data, see 18 U.S.C. § 2703(c)(2), or by querying databases that already contain that information.

significance. *See id.* at 395–96 (Gorsuch, J., dissenting). In fact, the second CSLI order only produced only two days of records, not the full seven as requested. *Id.* at 302. *Carpenter* does not suggest that the Fourth Amendment would condone warrantless searches for a shorter period of time or imply a *de minimis* exception to the Fourth Amendment. Rather, *Carpenter* explicitly declined to determine "whether there is [any sufficiently] limited period [of time] for which the Government may obtain an individual's historical CSLI free from Fourth Amendment scrutiny." *Id.* at 310 n.3; *see also In re Search of Info. Stored at Premises Controlled by Google*, 481 F. Supp. 3d 730, 737 (N.D. Ill. 2020) ("[T]here is much to suggest that *Carpenter's* holding, on the question of whether the privacy interests in CSLI over at least seven days, should be extended to the use of geofences involving intrusions of much shorter duration."). Likewise, the Court did not express a view on tower dumps or real-time CSLI because those facts were not present in the record. *Carpenter*, 585 U.S. at 316. But it would require misreading the rest of the Court's opinion to view this judicial restraint as an invitation to engage in such warrantless surveillance.

The Court's concern in *Carpenter* and *Jones* was the risk of exposing "indisputably private" information, "'the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on.'" *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring); *Carpenter*, 585 U.S. at 311. The tower dump warrants here would do

just that, placing devices inside nearby residences, churches, medical clinics, and hotels. ECF No. 6 at 10.

Finally, as in *Carpenter*, tower dumps are remarkably "easy, cheap, and efficient compared to traditional investigative tools." 585 U.S. at 311 ("With just the click of a button, the Government can access each carrier's deep repository of historical location information at practically no expense."). And like GPS tracking of cars, "it is almost impossible to think of late–18th-century situations that are analogous" to tower dumps. *Jones*, 565 U.S. at 420 (Alito, J., concurring). A government could never deploy enough police officers or informants to obtain the information it can easily acquire through a tower dump. To capture every person's whereabouts within range of a cell tower would be practically impossible, prohibitively expensive, and inconsistent with basic freedoms in a democratic society. Cf. Hannah Arendt, Origins of Totalitarianism 431 (1968) (discussing corrosive effects of "a system of ubiquitous spying where everybody may be a police agent and each individual finds himself under constant surveillance").

In sum, cell phone users have a reasonable expectation of privacy in their CSLI obtained via tower dumps because, as in *Carpenter*, the data is comprehensive, retrospective, intimate, and easy for law enforcement access. And just as in *Carpenter*, the so-called "third-party doctrine" does not alter this calculus. The *Carpenter* Court was explicitly that cell phone users do not "voluntarily" assume the risk of turning over a comprehensive dossier of their physical movements to police in any "meaningful sense." 585 U.S. at 315. Because carrying a

phone is "indispensable to participation in modern society" and because a phone generates CSLI "by dint of its operation, without any affirmative act on the part of the user beyond powering up," the Court declined to extend the third-party doctrine to historical CSLI. *Id.* That same holding applies squarely to the CSLI in this case. As the *Carpenter* Court concluded, "[i]n light of the deeply revealing nature of CSLI, its depth, breadth, and comprehensive reach, and the inescapable and automatic nature of its collection, the fact that such information is gathered by a third party does not make it any less deserving of Fourth Amendment protection." *Id.* at 320.

### B. People Have a Property Interest in CSLI Obtained from a Tower Dump

Tower dumps separately trigger constitutional protections because they invade cell-phone users' property rights.[20] Although searches are often properly analyzed under the reasonable-expectation-of-privacy framework, the "reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test" for searches and seizures. *Jones*, 565 U.S. at 409. Under that test, when the government interferes with a person's possessory rights in order to obtain information, a search has occurred. *Id.* at 404–05; *accord Florida v. Jardines*, 569 U.S. 1, 5 (2013). Likewise, a seizure occurs when one's property rights are violated, even if the property is never searched. *Soldal v. Cook Cty.*, 506 U.S. 56, 62–64, 68 (1992); *see also Carpenter*, 585 U.S. at 397 (Gorsuch, J., dissenting) (noting that "the

---

[20] If this Court properly holds that a search occurred under the reasonable-expectation-of-privacy framework, it need not address whether a search independently occurred under the property framework.

traditional approach asked if a house, paper or effect was yours under law. No more was required to trigger the Fourth Amendment.").

Digital records can be a person's "papers" no less than physical documents. *See United States v. Warshak*, 631 F.3d 266, 285–86 (6th Cir. 2010) (recognizing that "it would defy common sense" to afford data less Fourth Amendment protection based on the medium of storage); *see also Riley*, 573 U.S. at 397–98 (describing personal data stored in the cloud as one's "papers and effects"). And a person can retain constitutional protection of their papers or effects even when those items are in another's possession, as is often true of electronic communications. *See, e.g.*, *Ex parte Jackson*, 96 U.S. 727, 733 (1878) (sealed letters in possession of postal service). The relevant question, then, is whether people hold enough of a property interest in their CSLI that it remains at least in part their "papers" under the Fourth Amendment, even though held by the cell-phone company.

They do. Possessory interest is defined as the "right to control property, *including the right to exclude others.*" Black's Law Dictionary (11th ed. 2019) (emphasis added); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights."). Property rights need not be exclusive to be effective, and a person can retain significant property rights in an item or location even if another entity holds equivalent or additional rights. *See, e.g.*, *Jones*, 565 U.S. at 404 n.2 (recognizing that a bailee of property has sufficient property rights for Fourth Amendment purposes).

Determining whether the government has interfered with the security of one's papers or effects within the meaning of the Fourth Amendment requires assessing a person's property rights in those items, including by reference to common-law trespass and property principles, *see id*. at 404 n.2, 404–05, or positive law (*i.e.*, statutes, regulations, and similar enactments), *see Carpenter*, 585 U.S. at 402–03 (Gorsuch, J., dissenting); *State v. Wright*, 961 N.W.2d 396, 415–17 (Iowa 2021) (relying on municipal ordinance to hold that police seizing and examining garbage is a trespassory search that requires a warrant under the state constitution).[21] When the law protects against access by the public without consent, unreasonable access by the government is prohibited as well. *Carpenter*, 585 U.S. at 402–03 (Gorsuch, J., dissenting); *Wright*, 961 N.W.2d at 417.

Positive law establishes the relevant property interests in the CSLI at issue here. The federal Telecommunications Act requires "express prior authorization of the customer" before a service provider can "use or disclos[e] . . . call location information," 47 U.S.C. § 222(f), and provides "customers a private cause of action for damages against carriers who violate the Act's terms," *Carpenter*, 585 U.S. at 405 (Gorsuch, J., dissenting) (citing 47 U.S.C. § 207). The Act also designates location information as "customer proprietary network information" ("CPNI")—a category of records that the service provider cannot disclose without "approval of the customer." 47 U.S.C. § 222(c)(1)–(2), (h)(1)(A). As the Federal Communications Commission explains, location information "clearly qualifies as CPNI," and

---

[21] *See also* William Baude & James Y. Stern, *The Positive Law Model of the Fourth Amendment*, 129 Harv. L. Rev. 1821 (2016).

21

therefore subjects service providers to "a duty to protect [its] confidentiality." *In re Implementation of the Telecomms. Act of 1996: Telecomms. Carriers' Use of Customer Proprietary Network Info. and Other Customer Info.*, 28 FCC Rcd. 9609, 9616 ¶ 22, 9619 ¶ 29 (2013). And "to the extent CPNI is property, . . . it is better understood as belonging to the customer, not the carrier." *Second Report & Order and Further Notice of Proposed Rulemaking, In re Implementation of the Telecomms. Act of 1996*, 13 FCC Rcd. 8061 ¶ 43 (1998), *vacated on other grounds by U.S. West, Inc. v. F.C.C.*, 182 F.3d 1224 (10th Cir. 1999). When carriers have violated these provisions by denying customers the right to control others' access to their location information, they have been subject to aggressive enforcement actions by the FCC and to private suits.[22]

Given these protections, "customers have substantial legal interests in this information, including at least some right to include, exclude, and control its use." *Carpenter*, 585 U.S. at 406 (Gorsuch, J., dissenting). In other words, individuals have a property right in their cell phone location records, making those records "their" papers for purposes of the Fourth Amendment. Where, as here, the

---

[22] *See, e.g.*, Jennifer Valentino-DeVries, *Cellphone Carriers Face $200 Million Fine for Not Protecting Location Data*, N.Y. Times (Feb. 28, 2020), https://www.nytimes.com/2020/02/28/technology/fcc-cellphones-location-data-fines.html. In addition, the federal Communications Assistance for Law Enforcement Act, which otherwise requires phone companies to build lawful interception and surveillance capabilities into their networks, prohibits use of the federal pen register statute to "obtain any information that may disclose the physical location of the subscriber['s cell phone]." 47 U.S.C. § 1002(a)(2).

government seeks access to those papers, it effects both a search and seizure requiring a valid warrant.[23]

## II.    Tower Dumps Are General Warrants

The Supreme Court has never sanctioned a search as sweeping as a tower dump, with or without a warrant. This is for good reason: tower dumps are modern-day general warrants and the epitome of "dragnet type law enforcement practices" that the Court has long feared. *United States v. Knotts*, 460 U.S. 276, 283–84 (1983). By design, tower dumps sweep up the location data belonging to hundreds or thousands of people without probable cause to believe that most of those affected have committed, or have evidence related to, a crime. They also leave to the officers' discretion how to manage the vast trove of private (but irrelevant) information that the government obtains. No valid warrant can issue to authorize such electronic dragnets.

Although at the time of the founding it would have been inconceivable that police could trawl through databases revealing the locations of nearly every person to identify a suspect, the Founders were well aware of—and rejected—the ability of law enforcement to conduct such searches. As the Supreme Court has repeatedly recognized, opposition to general warrants "helped spark the Revolution itself," demonstrating the degree to which they offend the most basic principles of American liberty. *Carpenter*, 585 U.S. at 304; *see also Riley*, 573 U.S. at 403;

---

[23] Under the property-based approach, a request for even one data point in which a person has a property interest is a search and seizure. Thus, finding a search under the property-based approach does not hinge on the duration or breadth of the data requested.

*Stanford*, 482–83   (describing the "battle for individual liberty and privacy" as finally won when British courts stopped the "roving commissions" given authority to "search where they pleased"); *Marcus v. Search Warrants of Property*, 367 U.S. 717, 728 (1961). At the time of the Revolution, a general warrant was one that failed to identify the people to be arrested or the homes to be searched. *See Steagald v. United States*, 451 U.S. 204, 220 (1981) ("The general warrant specified only an offense . . . and left to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched."). And the very purpose of the Fourth Amendment prohibition against "unreasonable search and seizure" was to outlaw the government's authority to engage in "exploratory rummaging" through a person's belongings. *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (noting that this was the "'specific evil' of the 'general warrant' abhorred by the colonists").

Yet approval to rummage is the undisguised purpose of the tower dump warrants here, which seek access to a vast array of private location data of a potentially unlimited number of people in nine amorphous areas. This is equivalent to authorizing the search of every home within the radius of a reported gunshot or allowing law enforcement to search the bags of everyone in the neighborhood of a theft. But the Supreme Court has long held that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). Instead "a search or seizure of a person must be supported by probable cause

24

particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Id.* It also applies with equal force to searches and seizures, as the Fifth Circuit recognized in *Smith*. *See* 110 F.4th at 837. By infringing on these interests *en masse*, tower dumps run head-on into constitutional prohibitions on general warrants.

To begin, tower-dump warrants are overbroad because they necessarily compel disclosure of the location information for hundreds or thousands of phone numbers, allowing police to track a myriad of individuals with no connection to the crime under investigation. For example, in one of the earliest known tower-dump cases, the FBI sought four tower dumps that reportedly returned the location information for *150,000 people*.[24] The four tower-dump warrants in this case seek the unique identities of all cell phones communicating with the closest cell sites to nine different locations, over a nearly four-hour span, and could reveal the locations of "hundreds if not thousands" of people "given the population density of the covered areas." ECF No. 6 at 10.

Even tower dumps that sweep in far fewer innocent people are irremediably overbroad. The government knows that most people caught in the net of a tower dump are uninvolved in any crime under investigation. Law enforcement can

---

[24] Ellen Nakashima, *Agencies Collected Data on Americans' Cellphone Use in Thousands of 'Tower Dumps'*, Wash. Post (Dec. 9, 2013) https://www.washingtonpost.com/world/national-security/agencies-collected-data-on-americans-cellphone-use-in-thousands-of-tower-dumps/2013/12/08/20549190-5e80-11e3-be07-006c776266ed_story.html.

therefore never establish a sufficient nexus between hundreds or thousands of people's private information and the alleged offense. The pre-digital analog, a government agent examining documents or searching houses based on mere proximity to a crime scene, would never have been accepted at the time the Fourth Amendment was adopted. Thus, as the *Smith* Court recognized, even "all persons" warrants authorizing the search of everyone at a specific location still require "probable cause to believe that all persons on the premises at the time of the search are involved in the criminal activity." 110 F.4th at 836–37 (quoting *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 276 (4th Cir. 2004)).

The tower dump warrants here cannot meet this standard. As Magistrate Judge Harris concluded, the government has "not presented probable cause to believe that any particular individual committed any of the specific crimes described," despite listing seven potential suspects. ECF No. 6 at 13. And while the government believes that the searches will reveal "*unknown*" suspects, this is not sufficient to authorize a search "of every single individual near the crime scenes without a showing of probable cause as to each individual." *Id.*; *see also United States v. Chatrie*, 590 F. Supp. 3d 901, 927 (E.D. Va. 2022) (finding that a geofence warrant "lacked any semblance of such particularized probable cause to search each of its nineteen targets, and the magistrate thus lacked a substantial basis to conclude that the requisite probable cause existed."), *aff'd* 136 F.4th 100 (4th Cir. 2025) (*en banc*) (*per curium*).

The tower dump warrants in this case are also overbroad because they target multiple wireless providers without probable cause that any one of them is in possession of relevant CSLI evidence. The Fourth Amendment requires probable cause that the evidence to be seized will be found in the place to be searched. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 551 (1978). Here, this means that the government must have probable cause that evidence of the specified crimes is in the possession of the service provider(s) they intend to seize the data from. *See United States v. Fuentes*, Case No. CR-21-358-RAW at *24 (E.D. Ok. 2024), *adopted*, *United States v. Fuentes*, 2025 WL 484628 (E.D. Ok. 2025) (suppressing, in part, because enforcement made "absolutely no showing in the Affidavit for Search warrant that Google held evidence of a crime in its Location History data since it had no idea who committed the crime."); *In re Search of Info. that is Stored at Premises Controlled by Google*, 542 F. Supp. 3d 1153, 1156 (D. Kan. 2021). But investigators have no idea which, if any, phone company might be in possession of CSLI data linked to an unknown suspect. In short, the government seeks warrants for all four wireless providers in the area because they have probable cause for none of them in particular. It would be akin to serving warrants on every bank in the county on the theory that one of them may have the proceeds of a crime in an unknown safe deposit box. Such dragnet searches would fail the probable cause requirement and have all the characteristics of a general warrant. *See Snitko v. United States*, 90 F.4th 1250,

1263–66 (9th Cir. 2024) (finding that a purported inventory search of 700 safe deposit boxes violated the Fourth Amendment).

Nor are tower dump warrants sufficiently particularized. The purpose of the particularity requirement is to prevent general warrants, which it does by "limiting the authorization to search to the specific areas and things for which there is probable cause to search." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). With respect to seizures, the Fourth Amendment demands that "nothing is left to the discretion of the officer executing the warrant." And where, as here, there are significant First Amendment concerns—especially due to the proximity of multiple churches—the particularity requirement takes on heightened importance. *Stanford*, 379 U.S. at 485; *Marcus*, 367 U.S. at 729; *Quantity of Copies of Books v. Kansas*, 378 U.S. 205, 212 (1964). But tower dump warrants leave it to the officers' discretion how to search, use, share, and store this sensitive information.

The government may contend that the tower dump warrants specifically describe what they seek to search (multiple cell towers), and what they want to seize (call detail records from defined windows of time). *See* ECF No. 6 at 2. But there is no probable cause to believe all that information is relevant, and by their nature, the warrants cannot state with particularity which individuals it is searching—let alone the name of a single targeted individual or phone number. *See, e.g.*, *Groh v. Ramirez*, 540 U.S. 551, 558 (2004) (noting that the warrant lacked particularity because the warrant "did not describe the items to be seized *at all*"); *see also United States v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013) (noting that there

28

is a "heightened sensitivity to the particularity requirement in the context of digital searches."). As a result, law enforcement would obtain the records for hundreds or thousands of people, leaving decisions about how to analyze, access, and retain them up to the discretion of investigators. As the Magistrate Judge recognized, "[o]fficers will not know which cell phone or phones belong to their suspects until they comb through the lists of all phones in the areas of the crimes and cross reference those lists for commonalities," potentially generating false positives. ECF No. 6 at 14 n.14 (citing *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 325 (1979)). Courts cannot constitutionally condone such rummaging through the private data of innocent people just to see what turns up. *See In re Search of Info. Stored at Premises Controlled by Google*, 481 F. Supp. 3d at 737.

The very purpose of tower dump warrants is to dig through the sensitive personal location data of everyone in a geographic area in the hopes that one of them is a suspect. "This is the hallmark of a general warrant – aimless searching with only the hope that the result will justify the means." *Fuentes*, 2025 WL 484628. While there are ways to limit tower dumps to specific towers and antennae covering the area of the crime, these merely limit the volume of private data seized. Tower dumps do not, and in fact cannot, distinguish the search's subject(s) from the general public. Instead, they intentionally demand the private data from everyone in the area of a crime—including the general public. Thus, like the geofence warrant in *Smith*, tower dumps "*never* include a specific user to be identified, only a temporal and geographic location where any given user

*may* turn up post-search" and are therefore "constitutionally insufficient." 110 F.4th
at 837.

### III.   Tower Dumps Intrude on First Amendment Associational Rights.

Access to cell tower records also adversely impacts the public's freedom of
association under the First Amendment. U.S. CONST. amend. I. The records sought
here can be used to locate and identify people who are spending time in close
proximity to each other, whether that be a date, a school board meeting, or a
political demonstration. In addition, the calling records reveal who is
communicating with whom because the warrant seeks "source and destination
telephone numbers associated with each communication." ECF No. 6 at 2. Again,
this reveals personal relationships, and not only of the people who are near the
queried towers. Law enforcement can also ascertain the identity of callers
regardless of where they are using a simple subpoena.

The constitutional right to freedom of association protects against state
intrusion into our "choices to enter into and maintain certain intimate human
relationships." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617 (1984). The public is
entitled to protection from government intrusion in our political associations, our
intimate relationships, our organizational membership, and our basic
communications. *See NAACP v. Alabama*, 357 U.S. 449, 462 (1958) (recognizing
"the vital relationship between freedom to associate and privacy in one's
associations"). Where a law enforcement technique implicates these freedoms, there
is a heightened standard for constitutionality. *See Stanford*, 379 U.S. at 485

30

(searches must be conducted with "the most scrupulous exactitude" when the matter to be seized/searched implicates First Amendment freedoms).

Associational rights are intimately entwined with the privacy rights secured by the Fourth Amendment. In short, privacy is necessary for associational freedom, and associational freedom is necessary for a free society. *See Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (identifying freedom of association as "a right which, like free speech, leis at the foundation of a free society") (citation omitted). The Supreme Court recognized this principal again in *Carpenter*, where a major basis for ruling that there is an expectation of privacy in CSLI was that the location data reveals "the privacies of life." 585 U.S. at 305.

The knowledge that the government may be watching interferes with the exercise of the freedom of association. *See Jones*, 565 U.S. at 416 (Sotomayor, J., concurring) ("Awareness that the government may be watching chills associational and expressive freedoms."); *NAACP*, 357 U.S. at 462 (noting the "vital relationship between freedom to associate and privacy in one's associations").

Today, the potential chilling effect is made all-the-worse by law enforcement access to virtually effortless mass surveillance. *See Jones*, 565 U.S. at 415–16 (noting the difficulty in keeping electronic surveillance in check given its low cost). New technologies reveal to law enforcement, with "breathtaking quality and quantity," a "highly detailed profile" of our "political, religious, amicable and amorous" associations in addition to so much more. *People v. Weaver*, 909 N.E.2d 1195, 1199 (N.Y. 2009) (highlighting the ability of location information to track us

"to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue, or church, the gay bar and on and on."). For example, tower dumps from the site of a large protest will not just capture who was present, but can allow law enforcement to infer group membership, close ties between activists within the group, and more. *See* Susan Landau & Patricia Vargas Leon, *Reversing Privacy Risks: Strict Limitations on the Use of Communications Metadata and Telemetry Information*, 21 Colo. Tech. L.J. 225, 286–87 (2023). Indeed, the information that the government seeks from this tower dump would have been impossible to obtain just 15 years ago, at least not without witchcraft.

The threat posed by broad government access to call detail records is not hypothetical. Similar records have been stockpiled and used in secret ways before.[25] The Bureau of Alcohol Tobacco and Firearms used a geofence search, a reverse search technique similar to tower dumps, to surveil protestors who were within a broadly defined area near some arsons.[26] Police and University of North Carolina officers used a geofencing technique to surveil the social media posts of protestors as

---

[25] Virginia Police Have Been Secretively Stockpiling Private Phone Records, Wired (Oct. 28, 2014) https://www.wired.com/2014/10/virginia-police-secretively-stockpiling-private-phone-records/; Privacy and Civil Liberties Oversight Board, *Report on the Telephone Records Program Conducted under Section 215 of the USA PATRIOT Act and on the Operations of the Foreign Intelligence Surveillance Court* (Jan. 23, 2014), https://documents.pclob.gov/prod/Documents/OversightReport/ec542143-1079-424a-84b3-acc354698560/215-Report_on_the_Telephone_Records_Program.pdf.

[26] Russell Brandom, *The Verge*, *How Police Laid Down a Geofence Dragnet for Kenosha Protestors* (Aug 30, 2021) https://www.theverge.com/22644965/kenosha-protests-geofence-warrants-atf-android-data-police-jacob-blake.

well.[27] Tower dumps are one of the most recent and most-expansive version of a danger to our First Amendment freedoms.

## **CONCLUSION**

For the reasons above, this Court should hold that tower dumps constitute a search and seizure. The Court should further hold that the unprecedented, indiscriminate, and dragnet nature of tower dumps means they are unconstitutional general warrants.

RESPECTFULLY SUBMITTED,

NATIONAL ASSOCIATION of CRIMINAL DEFENSE LAWYERS, THE AMERICAN CIVIL LIBERTIES UNION, THE ACLU OF MISSISSIPPI, THE ELECTRONIC FRONTIER FOUNDATION, AND THE MISSISSPPI OFFICE OF THE PUBLIC DEFENDER

HICKMAN, GOZA & SPRAGINS, PLLC
Attorneys at Law
Post Office Drawer 668
Oxford, MS 38655-0668
(662) 234-4000 telephone
(662) 234-2000 facsimile
glewis@hickmanlaw.com

BY:   /s/ Goodloe T. Lewis
GOODLOE T. LEWIS, MSB # 9889

---

[27] Ari Sen, *UNC Campus Police Used Geofencing Tech to Monitor Antiracism Protestors* (Dec. 21, 2019)    https://www.nbcnews.com/news/education/unc-campus-police-used-geofencing-tech-monitor-antiracism-protestors-n1105746.

## <u>CERTIFICATE OF SERVICE</u>

I, GOODLOE T. LEWIS, do hereby certify that I have on this date electronically filed the foregoing document with the Clerk of Court using the ECF system which sent notification of such filing to all counsel of record.

This the 29th day of August, 2025.

<u>/s/ Goodloe T. Lewis</u>
GOODLOE T. LEWIS